The United States Court of Appeals for the Federalist Circuit is now open and in session. Now I'll say to the United States and this Honorable Court. Appeal No. 06-1539, Hutchins v. Zoll Medical. And Appeal No. 06-3405, Bagby v. United States Postal Service. On the two-case argument list this morning, we'll hear argument first in Appeal No. 06-5093, Ace Constructors v. United States. Counsel for the government? Yes, good morning, Your Honor. Thank you. Preliminarily, would you help me with the correct pronunciation of your name? Yes, Your Honor. It's pronounced Macklemale. Macklemale. Thank you very much. Please proceed. Thank you. I've reserved five minutes of my time for rebuttal, Your Honor. And please excuse my voice. It's the result of illness, not the game lesson. The Court should reverse and remand this case. The profilograph claim that the trial court adjudicated is based primarily upon two pieces of evidence that— Could I understand what's at issue here, because I'm not entirely clear from reading the briefs? On the profilograph claim, you say that the contract required profilograph testing, contrary to what the court of federal claims said. But do you also agree that requiring profilograph testing was unreasonable? I thought I saw some testimony to that effect. We do not disagree—well, we haven't challenged on the basis of—we can't argue that. It was clearly erroneous for the trial court to hold that it was inappropriate to the job, because there is evidence in the record that supports that claim. Okay, so you're not fighting that point at this point. That's right. So your argument then on the defective specifications sub-issue here with respect to profilograph testing is that there wasn't any evidence of reliance on the profilograph requirement. Yes. Okay. Now, with respect to the second claim on the rigid forms versus the slip forms, if I understand correctly, there are two separate arguments here. One, that use of the three-meter rigid forms was a defective specification. And as to that one, there seems to be a lot of evidence and conclusions by the court of federal claims that there was reliance on that, correct? No. No? No. And the reason on that, Your Honor, is because ACE's president and bidder testified—well, he agreed with us on cross-examination that any reasonable contractor would have known that rigid form paving was incompatible with the slump requirement. Well, that's where I'm confused. Are there two defective specification claims here under the second heading? One about the rigid three-meter forms and one about the two-inch slump? Were they presented as two separate claims? I sort of read the court of federal claims' opinion as finding two defects there, whereas the parties seem to treat it as one. Well, to some extent, the parties did treat them as one, but there are two or perhaps even three claims. The claim to the contracting officer was the specification requirement to use three-meter forms is defective. Now, that on its face was wrong. The contract did not require form paving in the first place. It allowed form paving. It allowed also slip form paving. The contract didn't require the use of three-meter forms either. It required the use—if forms were being used, that they be at least three meters. It seems to have some support that if the contract says you can either use rigid forms or slip forms, that that's a representation that either one of them will work under the contract and that the specification is defective in suggesting that the slip form approach would work and that that's part of their claim. Yes. Well, that is the claim they made to the contract. I mean, is the theory about that wrong? If a contract does say you can use A or B, isn't that a representation that either one will work? Yes, and we don't contest that argument. The problem in this case is that that claim was never brought to the contracting officer. What was brought to the contracting officer was the claim that because we have to use three-meter forms on this job, that's defective. Well, what's the evidence of that? That is the claim. That there is a serious variance between the claim as articulated to the contracting officer and the claim as litigated in the court below. The first step is to look at page 4841 of the appendix, which is the claim that was presented to the contracting officer. And that, in the second paragraph, I'm sorry, the first paragraph, the form claim was presented with these words. The second defect in the specifications was the requirement included in section 02753 part 3, and this is important. It's 3.5.5.1.B. To use three-meter long steel forms for the concrete pavement. That was the defect they identified. Was that the full scope of the claim? Yes. Was that the entire subject matter of that claim? Yes, and that's confirmed by pages 48, 68, and 69, which is the statement of their subcontractor, Cambrough, on this point. Well, how can that define what's in the claim? I mean, the claim is a piece of paper. It says what it says. How does somebody else's testimony change what the claim document itself recites? It should not, but that's what happened in this case. Because of the two-inch slump? Are you saying that the two-inch slump wasn't raised before the contracting officer but was raised before the court of federal claims? Yes, that and what Your Honor identified, the relative merits of slip-form paving versus rigid-form paving also, and these are things that can be seen in the trial court. So are you saying then that neither of the claims raised in the court below were in any way touched on in the filing with the contracting officer? Yes, except for one qualification. They did say to the trial court the profilograph test is both not required by the contract and inappropriate to the job. They said to the contracting officer only one of those two things. They said the profilograph test is inappropriate to the job. On the form claim, they only said to the contracting officer that the requirement to use three-meter forms is defective. That was the extent of it. To the trial court, they said we shouldn't have been even allowed to use rigid-form paving because rigid-form paving doesn't work on this job because of the dome shape, because of the direction of the lane. All right, let me interrupt you so I can follow. There were several different claim letters filed with the contracting officer, three or four of them, right? No, there were two. Two. One had to do with the dirt claim, which we're not challenging on this type of issue. So the claim filed with the CO that governs what we're talking about now, not the earth-moving issue, is at 4841 in the record? Yes, and then 4868 is a letter from their subcontractor that they attached to the claim as part of the claim presented to the contracting officer. Okay. And in none of those documents, Your Honor, did they say rigid-form paving itself— No, and in fact— No further communication? No, not as far as I'm aware or the record reflects. And all the contracting officer said on this three-meter form issue was the contract doesn't require three-meter forms. It requires you use at least a minimum of three-meter forms if you use forms. You don't have to use forms. And they decided to use three-meter forms. Their subcontractor did. But as I understand it, they made two arguments on this point before the Court of Federal Crimes. One, that the slip form had to be used because of the three-meter rigid forms not working with the grade breaks. And that that made the rigid-form paving approach commercially impractical, right? Yes. Okay. So that's one point. The other one was they said that the two-inch slump was inconsistent with rigid form. Were those presented as two separate claims before the Court of Federal Crimes? No. No. They were presented as the same claim. There were alternative reasons as to why rigid-form paving couldn't be used. No, not alternative reasons, but components of the same claim. And the claim they presented to the contractor also was that rigid-form paving does not work on this job for these several reasons. So you agree that if they won on either one of those theories, they would have won on the rigid-form paving thing. Put aside the jurisdictional issue for the moment. So if either the use of the three-meter rigid forms was incompatible, made rigid-form paving impractical, or the two-inch slump made it impractical, on either of those theories they could win. No. No, why not? Because of the lack of reliance. Because Mr. Fulkerson tested it. No, no, no, but assume reliance. Assume reliance, then yes. Yes, okay. Yes. So I hear you saying that unless the precise theory is presented at the beginning, there can never be any recovery on that theory when it reaches the court. No. It's not the theory so much. On the profilograph it is, because they're two completely different theories. But on the rigid form, it's not the precise theory. It is whether the contracting officer was given clear and unequivocal notice of the nature and basis of their claim. And the nature and basis of the claim to the contracting officer was very different than the nature of the claim to the trial court. The nature of the basis of the claim to the contracting officer was this contract requires us to use three-meter forms, and three-meter forms don't work. The contract didn't require the use of three-meter forms. It allowed the use of forms, and if forms were to be used, they had to be a minimum of three meters. And one of the components of their claim to the trial court was we can't span a 5.75-meter panel with a three-meter form and hit these grade rates. Well, of course, they're not required to use three-meter forms. They could have used 5.57-meter forms. They claimed it was commercially practicable, but none of that was brought to the contracting officer's attention either. The contracting officer was not given notice of the claim that was brought to the trial court on this issue, and therefore the trial court circumvented the contracting officer's report. What about the Scott-Timber case, which seemed to provide a very different sort of regime? That case seemed to suggest that as long as the same sort of relief is requested and the same set of operative facts are at issue, that the theory or the articulation of the claim to the contracting officer doesn't preclude litigation subsequent to his denial in the court of federal claims. Yes, and in that case, all the facts, the same operative facts were brought to the contracting officer as to the court. They were all about the suspension of those contracts. But the contracting officer was given one basis for their claim, the claim that the use of three-meter forms is inappropriate. So you're really saying it depends on how finally the contractor parses the claim. Whether to say that the specifications were defective in this area of the concrete, or whether in fact there must be that much detail, even though the contracting officer is an engineer. And I would think that these details would be clear to any engineer who looks at the contract and the specifications and the issues that were brought forward. The contracting officer, Your Honor, was not required to assume every possible permutation and logical extension of this argument. The contracting officer was told that this one paragraph, and one line in one paragraph, 3.5.5.1b was defective. The trial court was presented, and it's in the red brief, that 3.5.5, the whole rigid form paving specification, is defective. The contracting officer was not required to consider both the discreet claim about the one line in that one paragraph, in addition to everything else that could possibly have been brought before the contracting officer, before the trial court. The contracting officer is, the contractor must provide clear and unequivocal notice to the contracting officer. You're saying the way it works is that if it's clear to the contracting officer that in fact the contractor was correct, but didn't precisely word for word articulate the theory as might have been done, then the contracting officer, who is supposed to be a neutral arbiter in this case, nonetheless resolves it against the contractor. Well, if the contracting officer had stated in his opinion, in his decision, rigid form paving is appropriate to this job, then the trial court could adjudicate that claim because the contracting officer had been apparently notified of that claim at least implicitly. But that didn't happen here, and the contracting officer considered the claim that was presented to him, which was the requirement that we use three meter forms, which is not a requirement of the contract, is defective. Who submitted the claim? Ace submitted the claim. Who? Who wrote it? Mr. Fogelson. Is he a lawyer? No, he's not. Isn't it typical that the claims, as we call them, maybe we shouldn't even call them claims, but the submissions to the contracting officer where the contractor is upset about something are typically written by lay people, by executives of the contractor, not by lawyers. Yes, but they... Now, what you're comparing it with is a complaint filed in the court of federal claim as thereafter litigated, which was written by lawyers, right? Yes, but I don't compare it with that, because the complaint is in this record, too. The complaint doesn't articulate this claim either. The complaint simply refers to the claim in the... Well, I said as subsequently litigated. Yes. But the framing of the issues in the court below, starting with the complaint and going through the entire length of the litigation, represented articulations by a lawyer, right? Yes. So what you're saying is because the non-lawyer filing with the contracting officer wasn't as good a pleader as the lawyer, that they should be blocked from pursuing claims in the court of federal claims. No, Your Honor. They didn't even know about some of the facts that they relied upon to litigate the 3.5.5 claim. Well, what does that have to do with anything? Your case, if I understand it at all, is that the issues raised before the contracting officer were so different from the issues litigated in the court that the contracting officer never knew he was supposed to decide such matters, so he didn't decide them, and therefore the system was short-circuited, and instead of the first resort being to the contracting officer, a whole new case was presented to the court below. Yes, that's what happened. Well, that's what you say happened, and I'm trying to understand how we can judge that, because we're not comparing apples and apples, we're comparing apples and oranges. We're comparing informal submissions by non-lawyers to be adjudicated by non-lawyers at the CO level with litigation in front of lawyer judges by experienced lawyer litigators, and that's a little bit of an awkward comparison to make, because you're holding people to finite pleading-like requirements. And the inquiry is, when comparing the two things, the claim to the contracting officer and the claim to the trial court, was the contracting officer given clear and unequivocal notice of the basis of the claim that was presented to the trial court? In this case, the contracting officer was asked to look at 3.5.5.1b and the requirement in the words of the contractor and his subcontractor to use three-meter forms. That was the extent of it. So did you explain to the trial court that the case couldn't be there or couldn't be argued on the theories and the evidence that was being presented? Yes. And the trial court felt what, obviously in the interest of justice at least, that these theories should be reviewed? The trial court didn't articulate it that way. The trial court saw the claims to the contracting officer and to it to be the same. You moved to dismiss? No. Well, then what did you do? We brought this to the attention of the trial court in post-trial briefing. And requested what relief? We didn't move to dismiss. We brought it to the court's attention that it didn't have jurisdiction, which was the trial court's… What result did you suggest to Judge Leto should follow? We may have suggested that the court dismiss those claims. You're not saying that a court's jurisdiction depends on the theory? Which theory is being presented to it? It has jurisdiction of the parties, jurisdiction of the subject matter. What theory of jurisdiction are you raising? That this was a new issue? Is that jurisdictional? Yes, it is. It was subject matter jurisdiction. The court only has jurisdiction to consider the claims that were presented to the contracting officer. Are you relying on what, Grumman? On Scott Timmer. On all the line of cases that discuss what the jurisdictional prerequisites of a contract… Of course, the claim was presented. You're saying on the theory of the claim. No. No, you're… The claim… You're saying it was a totally different claim. That's what you're really saying. Yes. And it depends on how we define what is a claim and what isn't a claim. Yes, and this court has said that it requires a clear and unequivocal statement of the nature and basis of the claim. Well, it's operative facts, isn't it? And operative facts. rigid forms and that made use of the rigid form approach impractical, close enough, in my mind. But with respect to the two-inch slump claim, there's no notice of that in the claim of the contracting officer. But why does that make any difference since that's just an alternative theory for recovery on this rigid form paving claim? That would not… If the court disagrees with us that the contracting officers… The operative facts brought to the contracting officer were not the same as those brought to the trial court, then the slump issue on jurisdiction would not matter. It would only matter on reliance. Do you want to take one minute to tell us about DIRT? Yes. The trial court accurately articulated the rule on measuring an equitable adjustment as the extra costs incurred. ACE's manager testified that… Extra costs compared to what? Compared to what they expected to do. It's the earthwork they expected to do compared to the earthwork they had to do. Expected to do when? In grading… No, no, no. But their state of mind as of what point in time? At the time of bid. Okay. And when they were bidding the job, they identified 40,000 to 50,000 cubic meters of excess filth that they expected to have to scrape off that site. That's not what I understood the facts to be. Yes. I understood the facts to be that they expected, as the contract indicated, that they would neither export nor import filth. No. That's what they said at trial. But to the contracting officer on pages 42, 50, and 51 of the appendix, this was before they submitted a claim, they said that they were going to have to take 20,000… But that was way pre-bid as I recall the sequence. No. I thought they made an initial estimate, didn't trust their own estimate. Step two, they hired an expert to do it. The expert came up with a totally different conclusion. They bid relying on their expert's conclusion, and the government's experts had the same view. And therefore, the expectation of the bidder was neither import nor export, even though I earlier thought maybe I'd have to export. No. Actually, their expert gave them a number without any shrinkage or swellage numbers, which cannot be used as an accurate number, and there's testimony to that in the record as well. What they did was expected as much as 50,000 cubic yards to have to be pulled off that site. They expected to have to scrape it off, put it in trucks, and haul it off, which is the same task they did to bring… At the time they bid, they had that expectation? Yes. What's the evidence of that? Page 42, 50. What's that? That's a letter. That's an August 15, 2001 letter from Mr. Fulkerson that said on page 42, 50, the top of documents provided by the Corps that was utilized for bid takeoffs indicated that there was approximately 20,000 cubic yards of excess dirt on site. That's the bottom of 42, 50. What's the date of that? August 15, 2001. And what was the date of the bid? 2000. And Mr. Fulkerson further testified… I'm even more confused. This is a post-bid letter, which you're saying shows the pre-bid mentality or expectation of the bidder? Yes, it says it right there. The top of documents that was utilized for bid takeoffs indicated that there was approximately 20,000 cubic yards of excess dirt on site. I thought the testimony of the contracting officer – pardon me – the contractor's president was that he didn't rely on the Corps documents or his own calculations, that in making the bid he relied on the expert he hired. Is that not right? He testified that he relied on both things. But what we're saying, Your Honor, is that the trial court… Wait, wait, wait. Before we get to what you're saying, I'm trying to understand what he's saying. Yes, he's saying… I thought he was saying that he had varying estimates, but his final estimate was neither export nor import dirt, and that therefore his bid price was calculated based on the assumption of no export, no import. He said at least five different things on this topic, Your Honor, and we brought all those to the trial court's attention, and we asked the trial court to make a finding about what had to be pulled off, what they thought would have to be pulled off anyway, and what they had to bring on. I thought the final position in the contract solicitation was that there would be no net movement of dirt. In the solicitation? The solicitation said nothing about how much would have to be brought on, how much dirt had to be brought on. Did you raise this argument in your post-trial briefs with the Court of Federal Claims? Yes, in our pre-trial… Where in the post-trial briefs did you raise this issue? It's on pages 11510 and 11718. 11510? And 11718. We also brought it to the attention of the… But where exactly? It's 11714. 11714? Yes, it's 11715. On 11714, we point out the test, the measurement of equitable adjustment test, and then we say, if the court finds that ACE is entitled to an equitable adjustment, it should use 125,000 cubic yards as a basis and subtract a proportionate estimate of what it would have cost to grade off or charcoal off 50,000 cubic yards from the site. We also brought this up in our opening statement, but the trial court ignored this argument. You're saying that the trial court has no authority to exercise its equitable privileges when it seems appropriate as the facts evolve during a case? No, I don't say that. I say that having asked the court, having argued to the court that it should take this into account, and the court having ignored it, that's evidence that it committed clear error by not taking into account the earthwork that would have to have been done, even without the different site condition. You're saying that the court of Harlem didn't address this issue? Yes. You're saying you were entitled to have what could loosely be called an offset of tonnage? We were entitled to have it accounted for. It's not an offset. It's the proper measure of an equitable adjustment for a case like this. I understand it isn't an offset in the way we use that term legally. That's why I said using it informally. You want to have the recovery amount reduced by the estimated cost of the anticipated dirt removal. Not exactly. The recovery amount would be the difference between the unexpected cost and the expected cost. It wouldn't be reduced by anything. It would constitute that difference. I think we have that closely in mind. Let's hear from the other side. Can you unconfuse at least one member of the court about what the basic facts are here? Yes, Your Honor. I don't believe you are confused. I think Your Honor got it correctly. With respect to the dirt claim, you're asking about. The dirt claim testimony, and I was trial counsel below as well, was exactly as Your Honor set forth. Mr. Fulkerson on behalf of these constructors did an initial dirt takeoff where he calculated there may be 40,000 to 50,000 cubic yards or cubic meters of excess dirt generated from the site. He didn't trust his calculation. He hired a dirt takeoff expert, the company Dirt Tech that you've seen in the briefs. What was their estimate? Their estimate was that the job would be essentially balanced with the possibility of a slight amount of excess fill. And what was the court's estimate? The court didn't provide an estimate per se. However, they put on to testify their designer of record, their engineer of record. And he testified that his intention in designing the job was to provide a balanced job that would provide no excess fill and would generate no requirement to import fill. So if he achieved his goal, then there would be no net movement of dirt. Correct. And what Judge Leto found after hearing all of that evidence was that Ace determined the project would at least be balanced. Where are you reading from? Your Honor, I'm reading from the opinion page 18. I'm sorry, I don't have the records. Opinion page 18? Yes, sir. The trial judge's opinion. Okay, we're on that page. Your Honor, approximately a quarter of the way down, based largely upon this information, and he's referring to the dirt tech takeoff, Ace determined that the hot end of the project would at least be a balanced job and would potentially result in excess fill material. So my premise is that Judge Leto heard all of these facts and he made a determination that the job was balanced. There was a potential for some small amount of excess, and I believe he exercised his discretion in determining that that potential did not give rise to the certitude required. But he didn't say it. He didn't say it is the problem. He didn't say that. Yeah, but so, and it looks as though, do you agree that in the post-trial brief at 11715 that they raised this issue? The issue was raised, yes. Okay, so shouldn't we send this back to have Judge Leto make a clear finding about this given the fact that there seems to be some confusion in the testimony which ought to be sorted out by the finder of fact? Well, that is the most the government could ever hope for in terms of relief. Our premise is that although the judge did not expressly speak to it, when we take the totality of his fact findings into consideration and his conclusion at the end of that, that this potential for some modest amount of excess fill was simply not material and that that potential was too speculative to engage in providing some… What are we supposed to be comparing here? I thought we were supposed to compare what the bidder expected based on whatever inputs he had when he calculated the bid price versus what actually happened on the site. Is that not correct? I think that is correct, yes. And so what was the strongest evidence that he expected a balanced job rather than the 50,000 cubic yards or whatever this figure is that the government is suggesting was the actual expectation upon bidding of the bidder? It was the evidence was unequivocal that the dirt tech company takeoff was the source of information that was primarily relied upon by these constructors in formatting that bid or estimating that quantity. The math, the other evidence was the math works when one looks at the actual plan sheets that the court provided and does the cuts and fills and goes through that calculus that in fact the job appears to be a balanced job. But there was evidence the other way too. Was there not that maybe they did expect to have excess fill to be trucked off? The evidence I think Your Honor may be referring to is the letter that Mr. McElmail referenced. The rest of the story was not told in the argument. When Mr. Fulkerson was asked about that letter, and that's the August letter that talked about there was a potential between 40 or 50,000 cubic yards of additional fill. What Mr. Fulkerson testified is, in fact I'm sorry this letter referenced a 20,000 cubic yard figure. Mr. Fulkerson testified on cross examination that that was erroneous, that the letter was erroneous, that he did not intend to refer to 20,000 cubic yards of excess fill. So the letter is erroneous, but the Court of Federal Claims could have found, I believe the letter, I think that was their expectation at the time, and therefore I award credit. The Court of Federal Claims could have reached that conclusion. The problem is we don't know what conclusion the Court of Federal Claims reached because there's no specific determination of this issue. Your Honor, I would posit to you that we do know what the Court considered. I have to admit we do not have a precise finding, as Your Honor is asking about, but the holding or his finding, Judge Olson's finding that I read to you from the opinion, I think clearly addresses that point, perhaps not with the specificity. Well, how can you say we have to infer that he addressed the point? It sounds like we have three numbers on the table here. 20,000 excess to truck off, 50,000 excess to truck off, or essentially none. Isn't that right? We have three totally different numbers. There are three different numbers out there, but we can narrow it a bit. Maybe we can't put the finest point out, but we know that Judge Leto discounted the original takeoff or estimate that Ace did on its own because Ace said, I disregarded that, and I went and hired— Now, which number is that? That's 50,000. That's 50,000. Okay. So Ace did not use that. Expresso said we didn't use it. We hired Dirt Tech, and we used Dirt Tech's work product. And their number was essentially zero. Their number was essentially zero. Then where did the 20 come from? There was a letter that Mr. Fulkerson wrote at one time to President Ace that referred to the potential for 20,000 additional cubic yards. He testified that at most that was an error, and what I probably intended to say is that I had a contingency of $20,000 for the slop factor, if you will, that might be involved in the dirt. I didn't mean to say 20,000 cubic yards. At most I meant to say the $20,000 safety net or factor that we put into our bid to account for some slight variations because we're doing an estimate. Well, why isn't Judge Dyke correct in suggesting that rather than an appellate panel guessing what mental steps the trial judge went through, we ought to send it back to the trial judge and ask him to explain what his mental steps were? Well— I mean, law shouldn't be about wild guesses. I agree. And if we have to make a wild guess, that just doesn't seem like a fair thing to ask us to do. And frankly, Your Honor, we're not going to lose a lot of sleep about that because we feel fairly confident that that, in fact, were the determination of this panel and Judge Watson would very easily deal with that issue. It looks that way to me, too. Therefore, it doesn't necessarily involve enormous delay or expense to the parties or inefficiencies in the trial court. It looks like a matter that could be fairly quickly and directly addressed. All the more reason to do it. I have to acknowledge that it would be easy to do this. How much of the recovery is based on the dirt movement? I'm sorry, Your Honor? How much of the total recovery, the damages, was measured by the movement? Your Honor, I don't remember the dollars issued. It was a fairly significant—several hundred thousand dollars, as I recall it, in terms of dealing with the additional dirt work, as we call it. The overall magnitude here is something in the order of $2 million? Yes, sir. Could I ask you a question on the first issue, unless there are more questions on it? Let's assume on the first issue, on the profilograph testing, let's assume we reject the government's argument on jurisdiction and find that the court of federal claims said jurisdiction. Let's assume that we read the contract as requiring profilograph testing contrary to what the court of federal claims said. Third, we find that profilograph testing was unreasonable in this contract, and then we come to the reliance prong. Did you put in any evidence of reliance that would support a finding that the contractor relied on this unreasonable requirement? Let me answer it this way, and I have to preface it by saying I don't completely understand the government's position on reliance, and this is why. With all the assumptions that Your Honor has given, the contractor presented himself to the site, and the court said, the profilograph is required. We are going to have you do this test, and it will be your acceptance test for smoothness and wobbliness of the concrete. We do that, and finally, also, as Your Honor said, the test is inappropriate. It doesn't work. That seems to be not an issue anymore. Our claim is in knocking our heads against the wall with the contractor repeatedly trying to obtain passing scores on this inappropriate test, he incurred significant additional labor and equipment time in doing that, in rework time. So that's my confusion about the reliance. We present, we're told by the court, you shall use this test, we use the test, it's inappropriate, and additional dollars are expended in trying to achieve a work product that meets the test, and we can't do that successfully. So what we asked for and what we were awarded was the cost attributable to the additional work effort to try to meet an inapplicable or inappropriate test. So you're saying there isn't a reliance requirement? It's just proximate cause. It's just generic proximate cause. And I've tried, and I can't see any more in there than that very simple proposition. It's just causation. As opposed to a situation in which there's an ambiguity in the specification, and you'd have to show that you relied on the particular meaning that you're claiming. Yes, exactly right. When we raised it in our brief, I don't know that we were particularly articulate in doing it, but Mr. Fulkerson said that he did not anticipate using the profile graph testing. He did not view that as something that was required by the specification. He did not include in his bid, therefore, the cost for actually doing the test, and that's a $5,600 charge for actually hiring a testing company to come in and do that test. But the real problem is you had to rework and rework and rework things in a vain effort to try to meet a test, which you say is not an appropriate test for this type of job to begin with. Yes, exactly. And is it your view that the government now agrees with you that this profile graph testing should not have been required? Well, absolutely. Six months into the job, Ace and Cambrough, the factual situation was Cambrough was the subcontractor in the payment. Ace did the drainage work. But regardless. Yes, they're killing each other, beating each other up. In fact, Cambrough left the job and was terminated for a period of time and then came back because of this profile graph issue. And the heads got together and determined, you know, it's not Ace's work on the subgrade. It's not Cambrough's bad work on the concrete. It's this darn test we're getting held to. Brought that to the Corps' attention. Six months into the project, the Corps of Engineers agreed. Across the board or just for certain parts of the job? Well, they did it in two steps. First, they did it for one big part. And they said the profile graph is not applicable. It's the wrong test. I remember that part. Then they went to the other big area shortly thereafter and said it is not the test for acceptability. And they only kept the profile graph in existence on, I think, the roadway, the long run where the testimony was. Yeah, it's okay to use that on the roadway. Do you dispute the roadway use of that particular profile graph test? It didn't cause any problems for the contractor. So there are no damages associated with the use of that test on the roadway? Correct. So all the damages came, you say, because of the use of the test in other portions of the job. The pallet storage area and the apron area. And the Corps only kept that test into effect. They still used it to find what they called the must-grind areas. They had a little anomaly. They used that test to say we'll have to come back and just grind that little anomaly. But they completely removed the test, as I said, six months, eight months into the job for the very purposes that ACE and Kansas are supposed to do. So how are we supposed to interpret that? That, in effect, if the contract required the test, the contract was implicitly modified by the post-contract behavior of both parties, that they ended up agreeing that this test was not applicable, not appropriate, not going to be relied on, not going to be used? Yes. We accept the premise that the contract required the profile graph. Remember Judge Leto made alternative findings, as we read your opinion. The test was not required, and certainly the test was not applicable, even if it was required or were required. But, yes, it's a very simple situation that the Corps, the owner, later determines that the test is not applicable and shouldn't be used for these purposes. But in the meantime, we had these additional costs, and they were recoverable. And the government's change of heart was not necessary for us to win that claim, but it certainly helped. Now, the alternative test, as I understand it, is sort of a straight-edge type test. Yes. Now, did your proof show that if the straight-edge test had been used in those early months for abandonment of the profile graph test, instead of the profile graph test, that the initially poured concrete would have met the requirements using the straight-edge test? I believe that is correct, and I think it was in the context of the bad readings from the profile graph test, these anomalies that it showed, would not show with a simple traditional straight-edge test, that this machine was reading problems that don't exist as problems if you use the other test. Did the government agree to that? That under the straight-edge test, the reworks would not have been required by the government? Frankly, I don't recall. I don't believe it was presented as an issue as such, as the court claims it. All right. Thank you, sir. Thank you very much. Mr. McAmel will give you two minutes for rebuttal. Thank you, Heather. Actually, ACE did pass the profile graph on two parts of the job. The decision to waive the requirement wasn't part to get them back to work, but the reliance is important because the Spearman Doctrine is not a doctrine of strict liability. A contractor has to both read the specification, he has to have read the specification that he's complaining about at time of bid, he has to have reasonably interpreted it, and he has to have built the assumptions drawn from that reasonable interpretation into his bid. ACE cannot prove that here because Mr. Fulkerson testified that he didn't read anything in this contract that required the use of the profile graph, and he decided to use straight-edge testing. I'm confused about this whole reliance point because it seems to me that they have a point here. They say, okay, let's assume it was required by the contract. The contracting officer told us to do it. Now everybody agrees, or at least you don't contest that it was unreasonable. We did what we were told, and we want to recover the cost. Why is there a reliance requirement on top of that? Because that's what this Court has said about defective specifications. That argument would also work the same way as if he had said, we never read this specification. We never even saw it. And this Court has held that that type of case doesn't work because the contractor has to have read, reasonably interpreted, and relied upon it. He has to, in effect, accept the warranty of suitability. He can't just have decided to do his own thing and then have encountered what happens with the specification. But it's not his own thing. That's the point. The contracting officer told him to do it. Well, that's what they claimed happened. That isn't what actually happened. But that's not necessary to find here in any case because if the contractor required it, it wouldn't be surprising that the contracting officer told him to do it. The point is that if they don't have built into their bid an assumption that profilograph testing, when applied, will work, they can't recover, and they don't have built into their bid that assumption because they decided to use only straight-edge testing, which is an unreasonable reading of this contract, given the shall-use language regarding profilograph, and therefore they can't recover. Otherwise, taking that reliance test out would allow any contractor not even to read the contract and say, well, we got on the job, and we started working, and this specification didn't work, and that specification didn't work, and they would be able to recover. That would turn this test into a strict liability test, which it is not. The contractor has to have already reviewed it beforehand. Well, in this case, I didn't understand anybody to be arguing that the bidder hadn't read the materials and hadn't read the contract. So why are we talking about a hypothetical case, the opposite of this case, where the contractor doesn't even read any of the documents? In this case, I thought it was understood that the contractor did read the documents. I say that to point out the three components of this reliance test, reading, reasonable interpretation, and reliance. But it's agreed that he did read it. Yes. And so where we disagree is whether his interpretation was reasonable or unreasonable. And also that, well, there's no disagreement that he didn't build any assumptions based upon… Right. So on points one and three, there's no doubt in anybody's mind what the true facts were. Right. So then the real issue is when he read it as giving him the option to use either the straight edge or the wheel, the profilograph, was that a reasonable reading or not? Well, that is one issue, but that's not the only issue. It's a three-part test. They have to meet all three parts. They only meet one. They only meet yes, we read it. They can't meet the we reasonably relied upon it, but even if they do, they can't meet that we – sorry, reasonably interpreted. But even if they do meet that one, they cannot meet that we relied upon it because they did not build it into their bid. It was not part of their assumptions in bidding the job. No, no. I don't follow you at all. If they read the contract as giving them the option and the option they elected was to use the straight edge test, then of course they wouldn't build into their bid calculations the more expensive, difficult, demanding profilograph test. So I don't understand how they somehow failed to meet point three. Because a contractor only relies upon the suitability of a specification if he bids assuming that that specification will work, and this contractor did not because this contractor decided not even to use it. His bid doesn't even – Oh, wait a minute. You keep saying he decided not to use it. He read the contract as giving him the choice to make such a decision. It's not like he just said, the hell with it. I'm not going to follow what the contract says. He said, I am going to follow what the contract says. It says I can either do A or B at my option. My choice is to do A, not B. Which is the definition of not relying upon a specification. His bid is – He is relying on it. I don't understand how you're saying that he's not relying on it. It seems to me he's precisely relying on it. Because – You disagree with whether his interpretation is reasonable, and I can understand how arguments could be made on both sides of that. But if we assume that his interpretation is a reasonable interpretation of the various contract provisions, you then say he has to lose anyway because he didn't rely on it. It doesn't make any sense to me. He did rely on it. Well, to belabor the point just a bit more here, if the contractor – It's not belaboring it because I don't understand it. This is a kind of labor, not belabor. We haven't gotten the clarity yet for me. I apologize. I meant from my standpoint that I am belaboring this point. But if the contract said you may use – if he interpreted the contract as saying, for example, you may use a pickup truck or a dump truck. And he says I'm going to use a pickup truck, but then he's told that the contract actually requires a dump truck. And then he finds that using dump trucks doesn't work. Then his bid does not fall apart in any way because of the use of dump trucks because he never even built into his bid the use of dump trucks. He doesn't need any extra cost to take into account the unworkability of dump trucks because his bid doesn't rely at all upon the use of dump trucks. And this is the very same thing in this case. Why isn't it the opposite? His bid seemed to assume he could use the straight edge. He'd pass all the tests. There'd be no rework done. In fact, the government required that the other test be used. It was more exacting. Lots of expensive rework was thereby required. He did the expensive rework. That rework was not part of what he bid. Therefore, he ends up incurring huge costs he had no way to expect. That seemed to me to be the ultimate of reliance. If he had said, yes, I am going to profilograph test this, and I recognize that there's going to be a lot of excess work because this is a much more exact test than a straight edge. And I'm going to build into my bid the extra complexity of complying with the profilograph test, then he would be able to get the extra cost. He wouldn't need them. He wouldn't need them. They would already be part of his bid. He would have anticipated the extra cost. He would have built them in. He wouldn't be entitled to any equitable adjustment. It seems to me it's exactly the opposite of what you're saying. And what Your Honor just articulated is exactly the reason for the reliance requirement. So contractors will build into their bid the assumptions to be reasonably drawn from the specification they later claim is defective. It's to protect the government against lack of reliance, and then contractors coming in and saying, we need extra work because… Spearing is what you're depending on? Yes. And it's projected. All right. Thank you. Thank you both. We'll take the case under advice.